Watson *v.* Railroad.

WATSON *v.* RAILROAD.

*(Nashville.* January 20, 1900.)

1. RAILROADS. *Rights of holder of ordinary ticket.*

Doctrine reaffirmed that the holder of a regular, ordinary railroad ticket, purchased at the usual full fare rate, is entitled to a full and unlimited right of passage thereon, despite unusual conditions limiting this right printed upon the face or back of the ticket. The ticket is not, in such case, the contract, but a mere token that the ordinary contract implied by law exists; and the law declares and regulates the reciprocal rights and duties of the parties thereunder. (*Post, pp. 199, 200.*)

Cases cited and approved : Railroad *v.* Turner, 100 Tenn., 214; O'Rourke *v.* Citizens' Street Railway Co., 103 Tenn., 124.

2. SAME. *Rights of holder of excursion ticket.*

But the holder of an excursion railroad ticket, purchased for a special occasion at a reduced rate, must take notice of and comply with such reasonable conditions as are printed on and made a part of the ticket. The requirement and condition that the return part of the ticket shall be stamped by a particular agent of the company is reasonable, and must be complied with by the passenger. The special character of the ticket affects the purchaser with notice of unusual conditions constituting part of it, although he may not be able to read. The passenger is bound, although he does not sign the contract and its contents are not explained to him. It is his duty, at his peril, to obtain the requisite information. (*Post, pp. 200–210.*)

Cases cited and approved : 127 U. S., 390; 132 U. S., —; 81 Miss., 364.

Cited and distinguished : 23 Fed. Rep., 765; 16 Pa. St., 67.

3. SAME. *Abandonment or waiver of rule or regulation.*

The failure of a railway passenger to have his return ticket stamped, as required by its terms and by the rules of the company, cannot be excused on the ground that other passengers, holding like tickets, had been permitted to pass on unstamped

Watson *v.* Railroad.

tickets, especially where it appears that such passenger had no knowledge of such fact. (*Post, pp. 210, 211.*)

Cases cited: 63 N. Y., 101; 47 Iowa, 82; 117 Mass., 544; 71 Pa. St., 432.

FROM WILLIAMSON.

Appeal in error from Circuit Court of Williamson County. W. L. GRIGSBY, J.

HEARN & McCORKLE for Watson.

HENDERSON & BERRY for Railroad.

WILKES, J. This is an action for damages for ejecting the wife of plaintiff, Aaron, from one of the passenger trains of the defendant company. There was a trial before the Court and jury, and verdict and judgment for the road, and plaintiffs have appealed and assigned errors. The facts, so far as necessary to be stated, are that the plaintiffs had bought what is termed in this record, excursion or Centennial tickets from Franklin, Tenn., to Nashville, Tenn., and return. These tickets were sold at a reduced rate of one-half fare, and were intended for both direct and return passage. The tickets had several coupons attached, one being for passage to Nashville, another for transportation to the Centennial grounds from the union depot at that city, another for admis-

sion to the Centennial grounds. Immediately fol-
lowing the latter, and in bolder print than the
ticket generally had upon it, was the following
notice:

"*To Purchaser*—Return part of this ticket must be
stamped by the joint agent at Nashville, Tenn., on
day of departure, to make it valid for passage."

Following this notice was a coupon for pas-
sage from the Centennial grounds to the union
depot, and another for return from Nashville to
Franklin.

Upon the body of the return ticket were the
words plainly printed: "Not good for return pas-
sage unless stamped by joint agent at Nashville,
Tenn."

Upon the back was indicated the place at
which the joint agent should stamp the date of
return, and directions were given to the joint
agent as to how the ticket should be stamped
and punched for the return. The tickets were not
signed, nor were they required to be, and it was
not required that the holder should be identified
further than that the ticket should be stamped as
indicated.

The purchasers of these tickets were negroes
who could neither read nor write, and the pro-
visions and stipulations of the tickets were not
explained to them by the agent who sold them
the tickets.

The purchasers rode on these tickets to Nash-

ville, and visited the Centennial grounds and other places, and when ready to return, entered the cars at the South Nashville depot, and not at the union depot, where the joint agent could be found. These tickets were not stamped, had not been presented for that purpose to the joint agent at Nashville, and were not inspected by any employee of the road when the parties entered the train to return home. A crowd of passengers boarded the cars at the same time, and there is evidence that a brakeman, or assistant conductor, announced in a loud tone to the crowd, as they entered the train, that tickets would not be good for return unless they were stamped, and plaintiff, Aaron, replied, "Mine are all right," referring to tickets held by himself and wife. The plaintiffs were carried some one and a half miles, and when it was ascertained that their tickets were not stamped, they were put off the train by the conductor's assistant, upon their refusal to pay fare, not having any money to pay it with, and they were compelled to walk back to Nashville, and, after having their tickets stamped, they went to Franklin by a later night train.

While quite a number of errors are assigned, both as to the admission of testimony and the charge of the Court, and the refusal to give special requests, we think there is nothing material in them, except as hereinafter indicated, and the case turns upon the question whether the require-

ment that the ticket be stamped in order to validate it, was reasonable, and, if so, was a compliance with that requirement indispensable to the use of the · ticket, and should the rule be enforced as against these parties, who were unable to read or write, and were given no special information or instruction as to the conditions printed on the tickets when they were purchased.

The Court, in effect, charged the jury that the railroad company had the right to make and enforce a reasonable rule in reference to the sale and use of its special rate tickets, and its application to the traveling public, and that it was for the Court to determine whether a rule was reasonable or not, and that a rule requiring a return ticket to be stamped, validated, or the identity of the purchaser established, when such sale was based upon a reduction of fare, and the ticket sold for a special purpose or occasion, would be a reasonable rule, and no other notice of the requirement or rule need be given than the matter printed or written upon the ticket to that effect; that the fact that the ticket was sold at reduced rates, and for a special purpose and occasion, would be sufficient challenge to the passenger to require him to ascertain the conditions without having his or her attention called specially to it by the agent, and the fact that the purchaser could not read or write would not change the rule, and that the requirement for

stamping in this case was reasonable, and if not complied with, and the ticket was not stamped, nor any effort made to have it stamped, then the plaintiffs would not have the right to ride upon it, and the railroad employees would have the right to eject them, unless they should pay fare, and the company would not be answerable for damages unless the act of putting them off was accompanied by rudeness, violence, unnecessary force, and acts of indignity not warranted by the facts. This charge presents the real matter of controversy in the case upon the merits. While the exact question here presented was not involved in the case of *Turner* v. *Railroad,* 16 Pick., 214, it was, to some extent, considered. It was held in that case that a sale of a railroad ticket at the usual full fare, and not for a special occasion, entitled the purchaser to a full and unlimited right of passage, and that a mere printing of conditions upon the face or back of such ticket, attempting to limit this right, would not have that effect, and would not carry notice to the purchaser of the condition and requirement, unless his attention was called to it, or it was known to him and assented to by him. This holding was based upon the theory that when a passenger purchases a ticket for transportation from one point to another over the road of a public carrier, and pays full or regular ordinary fare, the ticket is not intended as a

contract in itself, but as a mere token or the evidence of a contract which the law creates and which lies behind the ticket. In such case the law makes the contract, and regulates the reciprocal rights and duties of both carriers and passengers, and the ticket is a mere token that such contract exists, and that under it the passenger is entitled to be carried to and from the points named, without regard to a time limit printed upon it.

The ticket itself, however, is not presumed to set out the terms of the contract, and the passenger is not required or expected to look to it for any stipulations or conditions different from what the law imposes. This rule we consider to be beneficial alike to carrier and passenger, and well supported by the great weight of authority in this and other States. *Turner* v. *Railroad,* 16 Pick., 214, and authorities there cited.

In such cases of ordinary tickets the ticket is not the evidence of the terms of the contract of passage, and not conclusive of the right to passage, but only a token that the ordinary contract implied by law has been entered into. *O'Rourke* v. *Citizens' St. Railroad,* 103 Tenn., 124.

It was further said arguendo in the Tennessee case that tickets might be sold at reduced rates upon special occasions, and reasonable conditions and limitations might be annexed to their use, when known to the purchaser, and assented to by

him orally or in writing, and when so sold at
reduced rates for special occasions, this was suf-
ficient to put the purchaser upon inquiry, and
affect him with notice that some special terms
and conditions should be expected and looked for,
and the fact of buying such ticket when the
passenger had the option to buy the regular
ticket at usual rates, was sufficient to put him
on guard, and affect him with notice of unusual
terms attached to its use, and this, we think, is
a correct rule. Elliott on Railroads, sec. 1593,
and note citing cases.

It is not indispensable that the ticket contract
should be signed by the purchaser if he had
notice of the terms, or was put upon inquiry,
and assented to the requirements or conditions.
Ray's Negligence Imposed Duties, Passengers, Sec.
144.

We are of opinion the rule requiring the return
ticket to be stamped in order to be valid, is
reasonable, and should have been complied with.
*Mosher* v. *St. Louis Railroad,* 127 U. S., 390;
*Boylan* v. *Hot Springs Railroad Co.,* 132 U. S.;
*Edwards* v. *Lake Shore Road,* 81 Miss., 364;
Ray's Neg. Imp. Duties, Passengers, sec. 144.

The reason for requiring the tickets to be
stamped at Nashville was stated to be that pas-
sengers might not be able to buy them at re-
duced rates, upon the assumption that they were
going to Nashville, and then use them to inter-

mediate stations, where the usual and regular fare would be greater than the special rate or fare to Nashville, and the object and purpose of the special rate was, to induce persons to attend the exposition at Nashville in large numbers, which would compensate the road for the reduction in fares, and this, we think, is a valid and sufficient reason for the rule.

It is said with much force, and insisted upon with great earnestness, that even if such rule be reasonable and enforceable in ordinary cases, still it cannot be enforced as to persons who can neither read nor write, and who are not specially notified of the requirements and conditions upon which the tickets are sold and to be used, and it is stated that a large proportion of the population of the country cannot read or write, and specially is that true as to negroes; that it is a matter of common knowledge that negroes are ignorant, and unable to read or write as a general rule, and these passengers belonged to that race and class, and this fact being apparent, imposed on the agent a duty of giving them proper information and explanation.

It will be seen at a glance that this contention presents a serious question, and one which must largely affect railroad travel in those districts of our country where the negro population is found, and other uneducated people reside. If the public carriers of the country are required

to inform themselves whether passengers or ship-
pers can read or write, and, if they cannot, then
all conditions and requirements and rules are to
be explained orally to them, it would impose a
task upon such carriers that might become very
burdensome to carriers and . annoying to passen-
gers, and interfere materially with the dispatch
of business, both . as to passengers and freights;
and the rule must, perhaps, be logically extended
further so as to throw upon the railroads · the
duty of discriminating between the intelligent who
can easily comprehend the conditions and require-
ments, and others not so well informed, and not
so apt to grasp all the details of the contract
into which they are entering, and likewise pas-
sengers who do not understand our language
would be debarred from accepting any special
rates, as the terms and conditions could not be
explained to them, either in writing or orally,
unless the railroad employees should be versed in
the use and knowledge of different tongues, or
the tickets should be printed in different lan-
guages.

We are cited to two cases bearing upon this
feature of the controversy, the first being the case
of *Mauritz* v. *New York, etc., Railroad,* 23 Fed.
Rep., 765, and the second the case of *Camden Rail-
way Co.* v. *Baldauf,* 16 Penn. State, 67.

The first of these cases involved the effect of
a notice limiting the liability of the road for

baggage, which was printed on the face of the ticket. The purchasers of the tickets were foreigners, and could not speak, read, or understand the English language, and no explanation or information that a value limit was placed on their baggage was given them by any employee of the road. The tickets were third class, and sold at reduced rates, and contained other conditions beside the limitation of value upon the baggage. None of the special conditions and limitations were known as a matter of fact by the purchasers.

It was, in substance, held that because of this inability to read or understand the writing upon the tickets the purchasers were not affected with notice of the provisions contained therein, and were not bound by the special terms and conditions printed on the ticket, in the absence of any explanation of the same. It was also said that limitations as to liability for baggage could not be expected upon the ticket for passage fare, and hence would not be noticed.

The case of *Camden Railway Co.* v. *Baldauf*, reported in 16 Penn. State Reports, 67, is also a case in which there was an attempt to limit the liability of the carrier for baggage by general published notice and printed matter upon the ticket. It was held that such limitation of liability could be enforced if there was a special contract to that effect, but that the

terms must be plain and fully known to the purchaser. In this case the purchasers were Germans, and could not read or understand the English language.

The Court held in general terms that the carrier might limit its liability if it could show clearly that the party with whom it was dealing was fully informed of the terms and effect of the notice, and that the exemption rested upon the ground of a contract, express or implied, between the parties. The Court said, in substance, it would be absurd to hold the company not liable upon the ground that a special contract existed, when the purchaser was, undoubtedly, ignorant of its terms; that if the ticket is made the evidence of contract, it must be in a language the purchaser could understand, or the terms of the contract must be explained to the purchaser.

It will be observed that both of these cases involve a limitation of liability of the carrier, while the case at bar simply involves a question of the reasonableness and enforcement of a rule relating to the general conduct of the road's business, and the effect of a noncompliance therewith, and does not in any way relate to a limitation of liability nor a provision concerning the same. The theory upon which unusual terms in excur-
.sion tickets are upheld is that—

1. They are sold at reduced rates of fare and not at the usual or ordinary rates.

2. They are sold for special occasions and not for ordinary and unlimited use.

3. By accepting such ticket when he has the option to purchase the usual and ordinary ticket the passenger enters into a contract with the carrier different from that implied by law upon the purchaser of an ordinary ticket at full rates of fare.

4. The purchaser is bound in such cases by the terms of the contract. He is entitled to its advantages of reduced fare, and is bound by reasonable regulations for its use.

But the question recurs: Is such contract binding upon a party who cannot read or write, and who is not specially notified of its terms when he purchases, and can he, in such cases, be held to have assented to the terms and entered into the contract? We are of opinion that it is not more important to hold carriers responsible, according to the terms imposed by law in the sale of ordinary tickets at the usual rates when the terms of the contract are dependent entirely upon the law, and not upon contract, than it is to permit them, for reduced rates or other valuable considerations, to make such reasonable special contracts for carriage of passengers or property, as may be agreed on with the passenger or shipper, and it is as much the duty of the Court to enforce

the contract made by the parties in the latter case as it is to enforce the contract made by the law in the former case. It is equally for the benefit of the carrier and the public that the right to make these special contracts, when reasonable, should be upheld and enforced.

Large numbers of passengers take advantage of excursion rates who would otherwise not be able or willing to travel at all. People of limited means most generally avail themselves of these reduced fares, and do so with the full expectation that they will be subjected to requirements and inconveniences that they would not meet on ordinary occasions when paying full fare. On the other hand, carriers reap a benefit from them in increased travel with increasd receipts, though not the usual profits. It is not consistent with public policy to so restrict and hamper the use of such tickets as to prevent the running of excursions and the granting of such rates. To do so would be to deprive persons of limited means of the opportunities for travel which they desire. It would fall most heavily upon the class to which the plaintiff belongs, a class which it is a matter of common knowledge, generally avail themselves of such opportunities. Under the record in this cause, there can be no doubt that the plaintiffs knew they were purchasing excursion tickets for a special occasion, and at greatly reduced rates.

The plaintiff, Aaron, before he entered the cars at Franklin, remarked to a fellow passenger who had bought a regular ticket, that he ought to have bought one like his, as it was cheaper. It is evident that it was a matter of common information, and known to these parties in a general way, that their tickets were not the ordinary tickets good for one passage in one direction, but that they were round trip tickets, and had annexed to them some conditions and requirements not pertaining to ordinary tickets, though they did not and could not get that information from the tickets alone, because they were unable to read or write. They made no attempt to learn their terms and requirements. It is not shown that the road misled or deceived them or withheld any information asked for by them.

It appears from the record that at and about this time large crowds were daily thronging the cars of just such people as the plaintiff, Aaron and his wife, nearly all using excursion tickets, bound for the same destination, and crowding the cars to their full capacity. It is apparent how impracticable it would be, and what a serious obstacle it would prove to travel, to require that the terms and conditions of each ticket should be fully explained to each purchaser, nor could it be required that all the intending passengers should be collected together and orally instructed at one time, and if it should be held that agents

must instruct illiterate persons when they present themselves to purchase tickets, the burden would still remain upon the carrier, whenever a controversy arose, to prove that the agent did give such instruction to each particular purchaser, and when there are scores and hundreds of excursionists this would prove unreasonably burdensome and practically impossible.

From the evidence of Kidd, the conductor, and the other employees upon this train, it appears that colored excursionists during the Centennial, and on this occasion, thronged the trains until, in the language of the witness, "they looked like clouds of blackbirds," and it was impossible to enforce any rules or preserve any order among them when they were attempting to enter the cars. He describes them as pushing, crowding, rushing, and running over each other until it was impossible to restrain them sufficiently to require them to present their tickets for inspection before entering the cars. Upon such occasions the rules and precautions taken by the carrier to insure the safety and proper reception of passengers became unusually irritating and annoying to them and difficult of enforcement.

We think the most reasonable and the safest rule in cases like the present is that foreshadowed and outlined in the case of *Turner* v. *Railroad,* that when the purchaser buys a ticket at less than the usual fare he is put upon notice

20 P—14

that he may expect unusual conditions and special rules, and if he have the misfortune to be unable to read or write, the burden is upon him either to make that fact known to the agent, or to ascertain from some one who can read what are the terms and conditions of his ticket, and when it appears, as it does from the proof in this case, that he has actual notice of some terms and conditions, it does not matter that he cannot read or write, or learn of such terms from the face of his ticket.

We are convinced from the record that these plaintiffs, as a fact, knew that their tickets must be stamped in order to be valid for return passage, even though they could not read or write, and having accepted and used the tickets, they were bound to comply with the rule, and in the absence of such compliance were not entitled to passage on such tickets, and their ejection was not unlawful or actionable.

Upon motion for a new trial it was shown that several persons did use return tickets which were not stamped, and this, it is argued, shows an unjust discrimination against the plaintiffs, and an abandonment of the rule, and upon this newly discovered testimony a new trial should have been granted. It does not appear that there was any intention to discriminate between passengers, and such fact is not stated in the affidavit. There might have been, so far as we can know, reasons

Watson *v.* Railroad.

for not enforcing the rule upon certain days and putting it in force on others. The rush and crowd may have prevented the conductor from enforcing the rule rigidly, and some persons may have been overlooked. But the fact that other passengers, or even these plaintiffs, had been allowed to travel without having their tickets stamped on other occasions, would not abrogate the rule unless it was so common or frequent as to amount to a custom or an abandonment of the rule, and to mislead the passenger. It is not shown that these parties knew of such instances. On the contrary, it affirmatively appears they did not. The mere fact that unstamped tickets had been received on other occasions, or from other passengers, does not establish the custom nor affect the rule. *Hill* v. *Railroad Co.,* 63 N. Y., 101; *Stone* v. *Railroad Co.,* 47 Iowa, 82; *Wakefield* v. *Railroad,* 117 Mass., 544; *Dietrick* v. *Railroad,* 71 Pa. State, 432.

For the reasons indicated, we are of opinion there is no error in the verdict and judgment of the Court below, and it is affirmed, with costs.